**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

WILLIAM C. MARTINSKY,                   :
     Plaintiff,                        :
                                       :
v.                                      :        CIVIL ACTION NO.
                                       :        3:09-cv-759 (VLB)
CITY OF BRIDGEPORT, CHARLES             :
PARIS, FRANK SANTORA, JAMES             :
VIADERO and JAMES HONIS,                :
     Defendants.                       :        September 2, 2011

**MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION FOR**
**SUMMARY JUDGMENT [Dkt. #43 and #47]**

**INTRODUCTION**

Plaintiff, a former Sergeant employed by the City of Bridgeport Police

Department ["BPD"] brought this action: 1) under 42 U.S.C. §1983 and

Connecticut common law against Defendants Paris, Santora, Viadero, and Honis,

who are and/or were officers in the BPD, for false arrest in violation of the Fourth

Amendment to the United States Constitution and Connecticut statutory common

law, and 2) under the American with Disabilities Act [ADA], 42 U.S.C. §12101 *et.*

*seq.*, and Connecticut's Fair Employment Practices Act [CFEPA], C.G.S. § 46a-51

*et seq.*, to seek redress against the City of Bridgeport for disability

discrimination.

## I.     FACTUAL BACKGROUND

A. June 11, 2007 Incident

Several years prior to the incident on June 11, 2007, Sgt. Martinsky (Plaintiff) and Sgt. Paris (Defendant Paris) co-owned a restaurant business known as the Savoy Bar and Grill ["Savoy"]. [Dkt. #63, Pl. Rule 56 Stmt. ¶13].  The Savoy was located in a building at the corner block of State Street and Markle Court in Bridgeport, CT.  *Id.*  In October 2005, the parties' business arrangement ended when Plaintiff sold his share of the business to "Savoy on State, LLC," a group in which Paris had an interest, and Paris continued to retain an interest in the Savoy up to the date of the incident on June 11, 2007.  *Id.* at ¶14. Pursuant to the sale, Plaintiff sold and the LLC bought Plaintiffs interest in the assets of the restaurant, including furniture, fixtures, equipment, and inventory contained within the restaurant. [Dkt. #63, Ex. #20, at 1]. To effect this transfer of assets, the parties created a detailed inventory of the property included in the sale, which was attached to the agreement. *Id.* at pp.2-3. Sgt. Paris and his girlfriend, Ms. Viglione, were not involved in these negotiations and were not familiar with the terms of the agreement or the inventory list. [Dkt. #63, Ex. #7a, at 70-75].

Plaintiff visited the Savoy on June 11, 2007 while on duty and in uniform. [Dkt. #63, Ex. #1b, Dep. of Martinsky at 152:13-16; 152-53:25-1]. During the course of the visit, Plaintiff represented to Mike Falcigno, the owner of an adjacent business, City Lights Gallery, that the building custodian had given him permission to access the basement of the building, and asked that Mr. Falcigno

grant him access to the common area of the basement so that he could retrieve two circus posters because the Savoy had gone out of business. [Dkt. #63, Pl. Rule 56 Stmt. ¶¶18, 20].  Mr. Falcigno, having access to a key to the shared basement area, granted Plaintiff's request and unlocked and let Plaintiff into the shared area. *Id.* at ¶19.

While in the shared basement area, Plaintiff identified objects that he claimed were his lawful possessions, consisting of two antique PT Barnum Circus posters, two framed portraits, a neon beer light, a ceramic pot, some wine glasses, and seven chafing dishes. He moved these items into the adjacent City Lights Gallery's private locked storage area which can only be accessed from the common space of the building with the use of a key. [Dkt. #63, Ex. #1b, Dep. of Martinsky at 136-141]. The items were covered by a flag or a piece of fabric. [Dkt. #63, Pl. Rule 56 Stmt. ¶38].  Sgt. Paris, off duty and doing work at the Savoy, was later notified by Mr. Facigliano that he had given Plaintiff access to the basement and that Plaintiff had removed several items from the Savoy storage area. *Id.* at ¶¶ 16, 21. Later in the day, Plaintiff received call from Mike Falcigno informing him that Sgt. Paris was angry and yelling about posters, worried that someone had taken his things whilst conducting an inventory review. [Dkt. #63, Ex. #1b Dep. of Martinsky at 151:10-12].

When Sgt. Paris found out that Plaintiff had removed items from the Savoy basement area, he called Lt. Santora on his personal cell phone to notify him that Plaintiff had stolen property from the Savoy and asked him to come to the scene.

[Dkt. #63, Pl. Rule 56 Stmt. ¶¶6, 11]. The BPD then dispatched Lt. Santora to the location. *Id.* at ¶7.

Plaintiff arrived at the scene at the same time as Lt. Santora. [Dkt. #63, Ex.# 1b Dep. of Martinsky, at 151-52:13-23]. Once Plaintiff arrived at the Savoy, Sgt. Paris allegedly threatened him, stating "[he] will kill [him]" and that "[he's] going to have [Plaintiff's] pension." *Id.* at 278:14-25; [Dkt. #63, Pl. Rule 56 Stmt. ¶9]. During this dispute, Sgt. Paris told Lt. Santora that Plaintiff had stolen property belonging to either him or the Savoy, having gone into the basement earlier and taken various items. [Dkt. #63, Pl. Rule 56 Stmt. ¶11]. Among the items that Sgt. Paris alleged that Sgt. Martinsky had stolen were two antique PT Barnum Circus posters, two framed portraits, a neon beer light, a ceramic pot, some wine glasses, and seven chafing dishes. *See* [Dkt. #63, Ex. #12a, Bridgeport Police Department Incident Report No. 070611-244, dated June 11, 2007, at Bates #12]. Plaintiff claimed these items were not included in the asset sale when Plaintiff sold his share of the Savoy to Sgt. Paris in October 2005, and that documentation existed to support his assertion.[Dkt. #63, Ex.#1b, Dep. of Martinsky at 166:19-24]. In his deposition, Sgt. Paris stated that he initially told Lt. Santora over the phone that he "found that [Plaintiff] ... came in and removed items from the Savoy that the Savoy owned and took them and hid them." [Dkt. #63, Ex. #7b, Dep. of Paris at 152:4-7]. However, later in his deposition, Paris testified in contrast to his prior assertion that Plaintiff did not own the allegedly stolen items, stating that he told Lt. Santora and the officers at the scene, or would have told them if they had

asked, that the circus posters did not belong to the Savoy but rather to Plaintiff's friend. *Id.* at 154-60.

Lt. Santora instructed Plaintiff to wait while he talked to Sgt. Paris and examined the scene. [Dkt. #63, Pl. Rule 56 Stmt. ¶12]. Lt. Santora then spoke to Mr. Falcigno, who was at the scene. [Dkt.#44, Defs. Rule 56 Stmt. ¶12].  All of the doorways by which to gain access to the common area of the basement were locked. [Dkt. #63, Pl. Rule 56 Stmt. ¶33].  Plaintiff did not have a key to any of those doors. *Id.* at ¶35. Lt. Santora saw the allegedly stolen items under the stairs of the City Lights Gallery covered by a piece of fabric. *Id.* ¶37.

When asked, Plaintiff admitted to having moved these items from the common space of the building basement into the locked storage area of the City Lights Gallery. *Id.* at ¶42. Plaintiff also admitted to having moved the items for the purpose of securing them in a locked area where they would be inaccessible to other persons with access to the common space of the building basement. *Id.*

After exiting the building, Lt. Santora spoke with Plaintiff about the items in the basement, and Plaintiff again claimed that he owned the items at issue. [Dkt. #63, Pl. Rule 56 Stmt. ¶46]. Lt. Santora returned about 15-20 minutes later and informed Plaintiff he was being arrested, despite Plaintiff's attempts to tell Lt. Santora that the posters were his. *Id.* at ¶14.

Other officers arrived at the scene including Deputy Chief James Honis. *Id.* at ¶51. Plaintiff told Deputy Chief Honis that the items were his and that he had documentation of ownership. Once Honis confirmed that Plaintiff would give a

statement and produce the documentation, Honis told Plaintiff that he could leave. *Id.*

Although Deputy Chief Honis told Plaintiff he could leave, Lt. Viadero (who was then in charge because he was the senior officer from the Detective Division and had been summoned by Honis), instructed Plaintiff to stay. [Dkt. #63, Pl. Rule 56 Stmt. ¶51].  Paris's girlfriend and member of the LLC that owned the Savoy, Jennifer Viglione, then arrived at the scene.  *Id.* at ¶27. Plaintiff contends that the officers did not formally interview Ms. Viglione at the scene, but that she provided a statement to Lt. Viadero three days later representing that her boyfriend, Paris, had called her to tell her that he had noticed that several items were missing from the basement, including the two circus posters. *Id.*

Paris continued to threaten Plaintiff while Paris, Santora, Honis, Viadero and other officers who had arrived at the scene gathered on the corner and Plaintiff waited across the street. [Dkt. #63, Ex.#1c. Dep. of Martinsky at 284:16-20].  Lt. Viadero and the other officers at the scene were aware that Plaintiff was disputing ownership of the items, but felt that there was an element of deception in Plaintiff's actions in visiting the building, removing items from the basement, placing them in a locked compartment, covering them to avoid detection, and planning to return for the items at a later time. [Dkt. #44, Defs. Rule 56 Stmt. ¶54]. Lt. Viadero returned and told Plaintiff, as Santora had done previously, that he was being arrested. [Dkt. #63, Pl. Rule 56 Stmt. ¶55].

Once Lt. Santora issued Plaintiff a misdemeanor summons for larceny in the fifth degree, he was permitted to leave. *Id.* at ¶¶57-58.  However, later that

evening, Lt. Santora contacted Plaintiff and demanded that the Plaintiff return to sign the summons, which Lt. Santora neglected to have him do earlier. *Id.* at ¶58. Lt. Santora told Plaintiff that unless returned as requested, he would bring Plaintiff into the BPD and subject him to a formal booking process. Plaintiff met Lt. Santora, signed the summons, and was allowed to leave. *Id.*

## B. Discrimination and Hostile Work Environment

Plaintiff alleges that Paris' irrational and menacing behavior in conjunction with Paris' explicit threat to kill Plaintiff on June 11th made Plaintiff fear for his life. [Dkt. #1, Pl. Compl. ¶44]. Further, Plaintiff alleges that Lt. Santora and Lt. Viadero's actions in refusing to listen to Plaintiff and arresting him to appease Paris, as well as Deputy Chief Honis' ratification of Plaintiff's arrest made Plaintiff fear for his safety in the Department. *Id.* at ¶45.

On his first day back at work after the incident, Plaintiff was called into a meeting with then Chief Bryan T. Norwood, Deputy Chief Honis, and one or two union representatives, at which time the Chief formally informed Plaintiff that he was being placed on administrative status and assigned to booking, that he would be subject to a disciplinary inquiry, and that he would not be allowed to work overtime or to work with the public until the matter was resolved. [Dkt. #63, Ex. #1b, Dep. of Martinsky at 176-179, 185-86; Ex. #23]. In response, Plaintiff informed Chief Norwood that he believed that had not done anything wrong and that he had been threatened by Paris and feared for his physical safety. *Id.*

After Plaintiff's arrest, Plaintiff alleges that Sgt. Paris continued to act in an angry and menacing manner, specifically alleging that: (1) Sgt. Paris went to court while on-duty and/or in uniform on dates when plaintiff was scheduled to appear in connection with the criminal charges against him and spoke to the prosecutors and glared at Plaintiff in an intimidating manner [Dkt. #63, #1c, Dep. of Martinsky at 211-12, 216];  (2) Sgt. Paris contacted the prosecutors handling the criminal charges against Plaintiff and improperly attempted to influence them to increase the charges against Plaintiff to a felony so that Plaintiff would face a more substantial penalty and/or the loss of his job if convicted [Dkt.#63, Ex. #1b, Dep. of Martinsky at 193-197; (3) Sgt. Paris went to see Mr. Falcigno, together with one or more other officers, in an attempt to influence and/or intimidate him into providing a written statement that would be more supportive of the criminal charges against Plaintiff *Id.* at 290-293; and (4) he went to booking while Plaintiff was working without apparent reason and behaved in an intimidating manner toward Plaintiff. *Id.* at 207-208, 296.

Plaintiff alleges that he became increasingly fearful of further harassment and/or retaliation by Sgt. Paris and/or his friends in the BPD because of their actions and because the administration did not respond to Plaintiff's concerns. Plaintiff asserts that he then began to suffer from acute anxiety, immobilizing panic attacks, and depression due to his arrest and the circumstances at work. During this time Plaintiff did not challenge his assignment to booking. [Dkt. #63, Ex. #1b, Dep. of Martinsky at 206-208; Ex. #1c, Dep. of Martinsky at 227].

The criminal charges against the Plaintiff were dismissed on October 2, 2007. [Dkt. #63, Pl. Rule 56 Stmt. ¶67].  After the criminal charges were dropped, the Plaintiff then went to the Chief around Oct. 2, 2007 and again informed him that he was afraid of Sgt. Paris and his friends and requested permission to stay in booking where he felt less threatened due to the presence of video surveillance. *Id.* at ¶68.

On October 9, 2007, Plaintiff submitted a letter to then Chief Bryan Norwood in which he informed him of a conflict he had with Sgt. Paris, Lt. Santora, Lt. Viadero, and Captain Brian McCarthy and his corresponding fear of retaliation. [Dkt. #63, Pl. Rule 56 Stmt. ¶69]. The letter also stated that Plaintiff expected to have pending civil matters in the future regarding his arrest and reiterated his desire to remain in booking so that he would have as little contact as possible with the listed officers. *Id.* at ¶70. The Chief granted Plaintiff's request to stay in booking. *Id.*

In December 2007, Capt. Porter notified Plaintiff that he was being taken out of booking and assigned to his regular patrol duties after the first of the year due to the Department's needs. *Id.* at ¶¶86; 87.  Plaintiff pleaded with Capt. Porter to reconsider his assignment to patrol from booking and again noted his safety concerns. *Id.* at ¶88. Capt. Porter responded that sergeants typically rotated through booking, and that Plaintiff's prolonged assignment to booking was in conflict with that policy. *Id.* at ¶¶84, 85]. Additionally, Capt. Porter informed Plaintiff that all police officers, regardless of rank or assignment, must be able to perform full duty work, meaning that all officers must be capable of performing all

duties of an officer with a post in patrol. [Dkt. #44, Defs. Rule 56 Stmt. ¶124; Ex. P, ¶20].

Between June 11, 2007 and the beginning of his sick leave began on January 2, 2008, Plaintiff did not make any other written requests to be assigned to another position in the BPD. [Dkt. #63, Pl. Rule 56 Stmt. ¶93]. During this time period, Plaintiff had no contact with Sgt. Paris during the course of his employment other than Plaintiff's allegations that: (1) Sgt. Paris came into the booking office once while Plaintiff was working without apparent reason and behaved in an intimidating manner; and (2) Sgt. Paris sent Plaintiff a letter, dated August 24, 2007, stating that Plaintiff was being taken off the overtime list because he had not worked overtime for 60 days.  [Dkt. #63, Pl. Rule 56 Stmt. ¶77.; Ex. #1b-c, Dep. of Martinsky at 207-08, 212, 294-96].

Plaintiff asserted that he was psychologically incapable of working patrol at that time and his condition deteriorated to such an extent as a result of defendants' actions that he was forced to go out on sick leave as of January 2, 2008. [Dkt. #63, Pl. Rule 56 Stmt. ¶95]. Plaintiff admits that prior to January 2, 2008, he had not specifically informed his superiors that he had a medical or psychiatric condition or disability that made him unable to return to regular patrol duty. *Id.* at ¶93. Plaintiff contends, however, that his superiors knew or should have known that he was suffering from "debilitating fear and anxiety." *Id.*

## C. Medical Treatment

Once on medical leave from the BPD, Plaintiff immediately sought treatment from a psychologist. [Dkt. #63, Ex. #1c, Dep. of Martinsky at 225]. Plaintiff's psychologist referred him to Dr. Klugman, a psychiatrist, who diagnosed Plaintiff with "Panic Disorder" on or around February 19, 2008 and prescribed medications. *Id.* at Ex. #9 at Bates 2.  Dr. Klugman also notified the BPD of Plaintiff's diagnosis. Dr. Klugman determined, around May 2008, that Plaintiff's injury had resulted in a permanent disability with respect to his current condition. *Id.*

On November 26, 2008, after he had been on medical leave and receiving medication and treatment for his injuries for almost a year, Plaintiff met with then Acting Chief Joseph Gaudett to discuss the possibility of returning to work with an accommodation for his health situation. [Dkt. #63, Pl. Rule 56 Stmt. ¶98].  At the meeting, Plaintiff requested placement in the canine unit. *Id.* at ¶100. Consistent with his preference for the protection of video surveillance available in booking, Plaintiff thought he would be better suited for work in the canine unit because he would feel safer with a police dog at his side for protection from physical harm and the separation of the canine unit would allow him to work independently from the officers who had threatened and/or taken other adverse action against him. *Id.* at ¶¶101-04. Lt. Perez then informed Plaintiff that the Chief had rejected his request for placement in the canine unit. *Id.* at ¶115. He noted that assignment in the canine unit is a seniority bid position according to the BPD's collective bargaining agreement. *Id.* at ¶105.  The seniority bid process

requires that any open position be posted, and the most senior officer to have submitted a bid be assigned to that open position. *Id.* at ¶106.  Defendants contend that Plaintiff's assignment in the unit might have violated the collective bargaining agreement. Defendants further contend that no open position existed at the time of Plaintiff's request. [Dkt. #44, Defs. Rule 56 Stmt. ¶¶105-13].

Lt. Perez then suggested that Plaintiff may be fit for placement in the training unit. [Dkt. #63, Pl. Rule 56 Stmt. ¶115].  Plaintiff did not feel able to return to work in the training unit because he understood that the unit was "wide open" and every police officer in the BPD, including Paris, had access to and attended training in the building such that he would not feel protected. *Id.*  Additionally Plaintiff noted that placement in the training unit was a less desirable position for him. *Id.* at ¶118.

On or around January 19, 2009, BPD notified Plaintiff that he would be subject to a psychiatric examination to determine, among many things, his fitness for duty. *Id.* at ¶126. After reviewing records related to Plaintiff's medical treatment and evaluating Plaintiff on March 9, 2009, the psychiatrist who examined Plaintiff on behalf of the City, Dr. Mark Rubenstein, diagnosed Plaintiff with Panic Disorder without Agoraphobia resulting from Plaintiff's work environment, the various incidents with his co-worker, his arrest, and other issues concerning the situation. *Id.* at ¶129. Dr. Rubenstein ultimately determined that Plaintiff was unable to return to his former duties or to any duties with the BPD. *Id.* at ¶130.

Plaintiff was retired on a disability pension on September 15, 2009, based on a finding that he was permanently disabled for the performance of his duties by reason of mental or physical disability resulting from injury received or exposure endured in the performance of his duty. *Id.* at ¶133.

## II. STANDARD OF REVIEW

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court "construe[s] the evidence in the light most favorable to the non-moving party and . . . draw[s] all reasonable inferences in its favor." *Huminski v. Corsones*, 396 F.3d 53, 69-70 (2d Cir. 2004). "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315 (2d Cir. 2006) (internal quotation marks omitted). "The moving party bears the burden of showing that he or she is entitled to summary judgment." *Huminski*, 396 F.3d at 69. "[T]he burden on the moving party may be discharged by 'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002). "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor." *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002).

### III. ADA & CFEPA CLAIMS

Plaintiff brings a claim under the ADA alleging that he suffers from ongoing conditions including panic attacks, anxiety and depression which substantially limit one or more of his major life activities, and that these conditions qualify as a disability within the meaning of 42 U.S.C. §12101 and C.G.S. §46a-51. [Dkt. #1, Pl. Compl. ¶76].  Plaintiff's claim under the ADA further alleges that the Defendant, the City of Bridgeport, failed to investigate or evaluate the nature of these disabilities in response to his request to remain in booking as an accommodation, and that the Defendant discriminated against by subjecting him to a hostile work environment, refusing to provide him with reasonable accommodation for his disabilities, and rendered him disabled from work as of January 2, 2008. *Id.* at ¶¶77-78.  Plaintiff asserts that this conduct constitutes employment discrimination on the basis of disabilities in violation of 42 U.S.C. §1201 and C.G.S. §46a-51. *Id.* at ¶¶79, 83.

Defendants' motion for summary judgment challenges Plaintiff's claim for a violation of the ADA on several grounds. Defendants' assert that there is no genuine issue of material fact that: (1) Plaintiff is not a qualified individual with a disability under the meaning of the ADA; (2) Defendants did not fail to accommodate the Plaintiff's claimed disability; (3) Defendants did not create, maintain or foster a hostile work environment as to Plaintiff. Additionally, Defendants motion for summary judgment challenges Plaintiff's claim for a

violation of CFEPA on the grounds that there is no genuine issue of material fact that the Defendants' conduct fails to meet the legal standard for the claim.

The conduct which Plaintiff alleges violated the ADA occurred prior to January 1, 2009 and is therefore analyzed pursuant to the statue as it existed prior to the ADA Amendments Act of 2008, which went into effect on January 1, 2009.

Disability is defined under the ADA as "(A) a physical or mental impairment that substantially limits one or more of the major life activities. . .; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *See Title 42 U.S.C. §12102(2)*; *Francis v. City of Meriden*, 129 F.3d 281, 283 (2d Cir. 1997). As the Equal Employment Opportunity Commission ("EEOC") is the agency that bears the responsibility for implementing specific provisions of the ADA, the Second Circuit generally defers to the EEOC regulations in construing the ADA's terms. *See Mueller v. Costello*, 187 F.3d 298, 312 & n.5 (2d Cir. 1999) (according "great deference" to the Equal Employment Opportunity Commission's interpretation of "disability" in employment discrimination case under title I).

In order to present a *prima facie* case of discrimination under the ADA, a plaintiff must establish that: (1) the employer is subject to the statute under which the claim is brought; (2) Plaintiff is an individual with a disability within the meaning of the statute in question; (3) Plaintiff could perform the essential functions of the job, with or without reasonable accommodation; and (4) the employer had notice of the plaintiff's disability and failed to provide such

accommodation. *See Capobianco v. City of New York et al.*, 422 F.3d 47, 56 (2d Cir. 2005) (citing *Shannon v. New York City Transit Auth.*, 332 F.3d 95, 99 (2d Cir. 2003); *Desmond v. Yale-New Haven Hosp., Inc.*, 738 F.Supp.2d 331, 343 (D.Conn 2010).

Defendants do not contest the applicability or the sufficiency of the allegations of the Complaint regarding the first element. It is undisputed that BPD is subject to the requirements of the ADA. The Defendants argue, however, that Plaintiff has failed to present sufficient evidence to establish the second, third and fourth elements of a *prima facie* case of discriminatory termination.

## A. REQUIREMENT TWO: DISABLED UNDER THE MEANING OF THE ADA AND CFEPA

### 1. DISABILITY UNDER THE ADA

To qualify as a disability under the ADA, the relevant impairment must be of a nature that "substantially limits one or more of the major life activities." 42 U.S.C. §12102(2)(A). While the list is not exhaustive, according to the EEOC "major life activities" include, *inter alia*, caring for oneself, walking, seeing, hearing, speaking, breathing, learning, and working. 29 C.F.R. §1630.2(i). Whether an impairment substantially limits a life activity is determined by considering: (1) the nature and severity of the impairment; (2) the duration of the impairment; and (3) the impairment's permanent or long-term impact. 29 C.F.R. §1630.2(j)(2). Although the determination of whether an individual is disabled within the meaning of the ADA is both individualized and fact specific, an individual is only substantially limited by an impairment when it renders the individual

"[s]ignificantly restricted as to the condition, manner, or duration under which [he] can perform a major life activity as compared to . . . the average person in the general population[.]" *Reeves v. Johnson World Services, Inc.*, 140 F.3d 144, 151 (2d Cir. 1998); 29 C.F.R. §1630.2(j).

### a.  ADA MAJOR LIFE ACTIVITY STANDARD

Plaintiff's impairments are not sufficient to constitute a disability within the meaning of the ADA. To meet the ADA's categorical definition of "being disabled," the claimant must show that the claimed physical or mental impairment substantially limits one or more of the major life activities. *Rogers v. City of New York*, 359 Fed.Appx. 201, 203 (2d Cir. 2009) (citing 42 U.S.C. §12102(2)(A) & (c); *Ryan v. Grae & Rybicki. P.C.* 135 F.3d 867, 869 (2d Cir. 1998)). While Plaintiff's impairment relates to "major life activities," such as thinking, concentrating and interacting with others, his impairment of these activities does not rise to the level of "substantially limiting" a life activity.

Plaintiff's impairment is appropriately classified as a mental impairment under the ADA. A mental impairment can encompass "any mental or psychological disorder, such as . . . emotional or mental illness" EEOC Regulations to Implement the Equal Employment Provisions of the Americans with Disabilities Act, 29 C.F.R. 1630.2(h)(2) (2007). Plaintiff claims that the incident on June 11, 2007 led him to suffer from acute anxiety, debilitating fear, frequent immobilizing panic attacks, stress and anxiety about the circumstances at work, sleeplessness, decreased concentration and the ability to socialize and interact

with others, and other physical symptoms, including stomach and chest pains, faintness, and diarrhea. [Dkt. #63, Ex. #8, Bates #22; Ex. #9, Bates #9; Ex. #10 at Bates ##5, 10].  A psychiatrist examining Plaintiff on behalf of the BPD later diagnosed him with Panic Disorder without Agoraphobia. *Id.* at Ex.#9, Dr. Rubenstein 4/03/09 Report at 10. Defendants do not appear to dispute that Plaintiff suffers from a "mental impairment" within the meaning of the ADA.

Plaintiff's alleges that the symptoms relating to his diagnosed Panic Disorder - abdominal pain and panic attacks - have affected several major life activities such as the ability to work, sleep, think, concentrate, and interact with others while working for the BPD. [Dkt. #63, Ex.#9, Dr. Klugman 4/03/09 Report at Bates # 9. In order to make a successful ADA claim, Plaintiff must show that his mental impairment substantially limits any of these major life activities. 29 C.F.R. §1630.2(j)(2). To establish that major life activities are substantially limited by his mental impairment, Plaintiff must demonstrate that certain factors relating to the impairment, including (1) the nature and severity of the impairment; (2) the duration of the impairment, and (3) the impairment's permanent or long-term impact, indicate that his ability to perform those life activities is substantially limited as compared to an average individual's ability to conduct the same life activity. *Reeves v. Johnson World Services Inc.*, 140 F.3d 144, 151 (2d Cir. 1998); 29 C.F.R. §1630.2(j).  Under the ADA, an impairment that is "episodic" qualifies as a disability "if it would substantially limit a major life activity when active." 29 C.F.R. §1630.2(j)(1)(vii).

### b.  MAJOR LIFE ACTIVITIES - NON-WORKING

Plaintiff has presented sufficient evidence to indicate that his impairment is severe. Plaintiff's impairment, a diagnosed Panic Disorder, is "a quite serious disorder" according to an independent psychiatrist who examined him. [Dkt. #63, Ex. #10, at Bates #10].  The disorder has caused Plaintiff to experience panic attacks that seemed "physical" and that caused him to feel "immobilized" with anticipatory anxiety. *Id.* at 4. These panic attacks caused Plaintiff "'chest pains, stomach pains, and shortness of breath,'" along with "faint feelings [and] diarrhea." *Id.*

However, even though at times Plaintiff's impairment was severe, the evidence presented is insufficient to establish a substantial limitation on a life activity in comparison to an average individual. Plaintiff was still able to think and interact with others at BPD and continued to communicate with his children. *Id.* at 10; Ex.#11, Report of Dr. Schechter 2/28/11, at 4. Despite his panic attacks, Plaintiff was able to work in booking between June 2007 and December 2007. Moreover, Plaintiff disclosed to Dr. Klugman that while his ability to sleep may have deteriorated shortly after his arrest in June 2007, it then improved from October through December, shortly before he went on leave from the Department in January 2008. [Dkt. #63, Ex. #9, Dr. Klugman Report, 2/19/08, Bates #6]. Dr. Klugman noted that Plaintiff's panic disorder did not prevent him from maintaining a relationship with his children, enjoying watching a basketball game, or cooking for himself. *Id.*

While Dr. Klugman noted that Plaintiff still suffered panic attacks at least once a day, the degrees of the attacks varied. *Id.* at Bates #9. Although Dr. Rubenstein found that "[i]t is also probabl[e] that his psychiatric disability will continue into the future and that it is permanent by this time," the nature of Plaintiff's disability did not cause the complete loss of his ability to interact with others. [Dkt. #63, Ex. #10, Dr. Rubenstein 4/03/09 Report, at 10; Ex. #11, Dr. Schechter Report, 2/28/11 at 4 (finding that as of 9/22/10 Martinsky's panic attacks have "left him with social avoidance" but he still remains in contact with his children].

Even construing the evidence in the light most favorable to the Plaintiff, he has failed to present sufficient evidence that his mental impairment substantially limited non-work-related major life activities, such as the ability to sleep, think, concentrate, and interact with others as compared to an average person.

### c.  MAJOR LIFE ACTIVITY - THE ABILITY TO WORK

Plaintiff also alleges that his panic disorder has substantially limited the major life activity of working. The major life activity of working is subject to more stringent restrictions with respect to whether a person is disabled under the ADA. The EEOC has stated that in the context of working:

> (i) The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. 29 C.F.R. § 1630(j)(3).

The Supreme Court has narrowed the EEOC's definition of "substantially limited" when asserting an ADA claim regarding the major life activity of working, holding that "[w]hen the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege that they are unable to work in a broad class of jobs." *Sutton v. United Air Lines*, 527 U.S. 471, 492 (1999), *superseded by statute*, ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat 3553, *as recognized in Ragusa v. Malverne Union Free Sch. Dist.*, 381 Fed.Appx. 85, 88 (2d Cir. 2010). In order "to be substantially limited in the major life activity of working . . . one must be precluded from more than one type of job, a specialized job, or a particular job or choice." *Sutton v. United Air Lines*, 527 U.S. 471, 492 (1999).

Evidence in the record indicates that Plaintiff's anxiety did not preclude him from a broad class of jobs. Rather, Plaintiff's "anxiety is specifically related to the police department." [Dkt. #63, Ex.#9, Dr. Klugman 5/7/09 Record, Bates #1]. An independent evaluation found that "it is highly probable that [Plaintiff] could not work in any capacity for the Bridgeport Police Department," but "[i]t is *possible* he might be able to work in another police department[.]" [Dkt. #63, Ex. #10, Dr. Rubenstein 4/03/09 Report, at 10 (emphasis in original)]. Further, evidence in Plaintiff's independent medical examination describes his diagnosis as "anticipatory anxiety, generalized anxiety, with regard to the Bridgeport Police Department, and specific anxiety as occurring at work and for various reasons related to work." *Id.*

Plaintiff's inability to continue to work in the capacity as a Sergeant in the Bridgeport Police Department does not qualify him as impaired from the major life activity of working. *See Giordano v. City of New York*, 274 F.3d 740, 748 (2d Cir. 2001) ("inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working"). In addition, Plaintiff must provide evidence of the qualifications for other employment that he cannot satisfy because of his impairment to demonstrate that his impairment precludes him from obtaining employment in a broad class of jobs. *Id.* at 749-50.

Plaintiff noted taking "i.t." (likely "information technology") or computer classes, looking to acquire his real estate license, and exploring business ideas as a means of seeking other employment, but did not include any evidence to suggest that his disability prevents him from working in those fields. [Dkt. #63, Ex. #9, Dr. Klugman Report, Bates # 11(Treatment Note 5/19/08 & 9/08/08); (Treatment Note 7/14/08); (Treatment Note 11/16/09)]. Plaintiff noted to his psychiatrist in May 2010 that he was "looking for work without success," but did not indicate that his impairment hindered him from attaining work. *Id. at* Bates #12 (Treatment Note 5/10/10).

Because Plaintiff has not presented evidence to demonstrate that his mental impairment rendered him unable to perform a broad class of jobs, he has failed to present sufficient evidence that his mental impairment substantially limited the major life activity of working.[1]

---

[1] Defendants' Motion for Summary Judgment also argued that the BPD did not regard Plaintiff as disabled, however this argument was not raised in Plaintiff's Complaint, nor did Plaintiff address this argument in his Memorandum in Opposition to Defendants' Motion for Summary Judgment. Plaintiff argues solely

**2.  DISABLED UNDER CFEPA**

**Count B of Plaintiff's Complaint incorporates all of the claims against the Defendant City as pleaded in the ADA claim, but brings them under the state law equivalent of the ADA, the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. §46a-60(a)(1), *et. seq.* (hereinafter "CFEPA"). The standard for analyzing whether or not an individual is disabled under CFEPA is significantly broader than the ADA standard. *See Beason v. United Technologies Corp.*, 337 F.3d 271 (2d Cir. 2003) (holding that CFEPA's definition of physical disability is broader than the ADA's). Whereas the definition of disability under the ADA includes the requirement that the physical impairment substantially limit one or more major life activity, the CFEPA definition of disability includes "any individual who has any chronic physical handicap, infirmity or impairment." *See id.* at 6-7. Although Plaintiff's condition, Panic Disorder without Agoraphobia causing abdominal pain and panic attacks likely qualifies as a disability under CFEPA, it is unnecessary for the Court to reach a determination on this point because Plaintiff's CFEPA claim has not established that he was denied a reasonable accommodation.  The standards regarding reasonable accommodation are identical under the ADA and CFEPA. *Curry v. Allan S. Goodman, Inc.*, 286 Conn. 390, 403-04 (2008). Accordingly, the same analysis applies to the Plaintiff's CFEPA claim as to the ADA claims. Although Plaintiff's mental impairment qualifies as a disability under the broader standard of CFPA,**

---

**that he was disabled under the meaning of the ADA. Accordingly, the Court need not address this argument.**

the BPD's provision of a reasonable accommodation precludes both Plaintiff's

CFEPA and ADA disability claims.


### B.  REQUIREMENT THREE: ABILITY TO PERFORM ESSENTIAL FUNCTIONS WITH OR WITHOUT ACCOMODATION

On January 2, 2008, Plaintiff left his post in patrol on sick leave, asserting

that he was psychologically incapable of working patrol. Defendants argue that

patrol duties are an essential function of employment as a member of the BDP.

Plaintiff disputes this assertion, arguing that it was not uncommon for officers to

be placed in short and long-term non-patrol assignments, thereby indicating that

patrol is not an essential function of the duties of a member of the BDP.

The EEOC regulations define the term "essential functions" as "the

fundamental job duties of the employment. 29 C.F.R. §1630.2(n)(1). As further

guidance, the regulations list the following factors for consideration in

determining whether a duty is an "essential function":

> (i) [. . .] the reason that the position exists is to perform that function; (ii) [there are a] limited number of employees available among whom the performance of that job function can be distributed; and/or (iii) the function [is] highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function. 29 C.F.R. §1630.2(n)(2).

Lastly, the regulations provide a non-exclusive list of evidence that may

appropriately be considered in evaluating whether or not a job function is

essential. This list of permissible evidence includes "the employer's judgment as

to which functions are essential," and "the consequences of not requiring the

incumbent to perform the function." 29 C.F.R. §§1630.2(n)(3)(i), (iv).

The Second Circuit, in *Stone v. City of Mount Vernon*, articulated the proper analysis for determining whether a job function is essential, including consideration of "the employer's judgment, written job descriptions, the amount of time spent on the job performing the function, the consequences of not requiring plaintiff to perform the function, mention of the function in any collective bargaining agreement, the work experience of past employees in the job, and the work experience of current employees in similar jobs. 118 F.3d 92, 97 (2d Cir. 1997).   In *Price v. City of New York*, the Second Circuit emphasized that a court may not simply rely on the defendant's assertion regarding whether or not a function is essential, but must careful consider all of the relevant factors, including, but not limited to, those listed in *Stone*. 264 Fed.. Appx. 66, 68-69 (2d Cir. 2008).

In support of its motion for summary judgment, the BDP relies on the testimony of Chief Gaudett stating that "all police officers in the Bridgeport Police Department, regardless of rank or assignment, must be able to perform 'full duty' work, meaning that all officers must be capable of performing all duties of an officer with a post in patrol. [Dkt. #44, Defs. Rule 56 Stmt. ¶124; Ex. P, ¶20]. This evidence is consistent with the EEOC regulations as evidence of "the employer's judgment as to which functions are essential." 29 C.F.R. §1630.2(n)(3)(i).

To refute the Defendants assertion that the patrol duty is an essential function, Plaintiff argues that officers are regularly assigned to long-term positions not involving a patrol function. However, even viewing the facts in the light most favorable to the Plaintiff, Plaintiff's evidence is insufficient to create a

factual dispute regarding the status of patrol duties as an essential function of the duties of a member of the BDP.  Plaintiff's evidence, taken as true, would merely indicate that officers are sometimes placed in short-and long-term positions that do not involve patrol functions, but Plaintiff has not provided evidence to suggest that the such placements are permanent such that the BDP has allowed an employee to maintain a position within the Department who could not perform a patrol function if required to do so.

The cases upon which Plaintiff relies in support of his argument are inapposite, because they address the question of essential function in circumstances where other employees were placed in *permanent* positions not requiring the performance of the relevant function. *See Russell v. City of New York*, No. CV05-0948, 2006 WL 2333729 (E.D.N.Y. 2006) ("If as a matter of practice the NYPD employs police officers in permanent non-patrol positions, this would refute defendants' assertion that patrol or firearm duty is an essential function of the job"); *Price*, 264 Fed.Appx. at 68 (considering Plaintiff's identification of six permanently disabled employees allowed to remain employed). Plaintiff has not presented any evidence to establish that officers of the BDP have been placed in permanent positions not involving a patrol function.

However, even if Plaintiff's evidence was sufficient to present a disputed fact regarding patrol as an essential function, it would be immaterial because the evidence from the record clearly establishes that Defendants provided a reasonable accommodation.

### C. REQUIREMENT FOUR: FAILURE TO PROVIDE REASONABLE ACCOMODATION

Assuming *arguendo* that Plaintiff was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation, under both the ADA and CFEPA, the failure to provide reasonable accommodations for an individual with a disability can constitute discrimination. *Wernick v. Federal Reserve Bank of New York*, 91 F.3d 379, 384 (2d Cir. 1996) (citing 42 U.S.C. § 12112(b)(5)(A)). Even if Plaintiff has a qualified disability under the ADA and CFEPA, the BDP provided Plaintiff with a reasonable accommodation.

Under the ADA, an employer is required to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the] covered entity can demonstrate that the accommodation would place an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

In *Borkowski v. Valley Cent. School Dist.*, the Second Circuit recognized that when raising a reasonable accommodation claim, Plaintiff bears the burden of production in identifying a reasonable accommodation. 63 F.3d 131, 138. Further, the Second Circuit explained that "reasonable" in the context of the ADA is a "relational term: it evaluates the desirability of a particular accommodation according to the consequences that the accommodation will produce." *Id.* Determining what is reasonable "requires an inquiry not only into the benefits of the accommodation but into its costs as well." *Id.* Once a disabled individual has suggested to his employer a reasonable accommodation, the employer must

engage in an "informal, interactive process" with the disabled individual "to identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Curry*, 286 Conn. at 416 (citing 29 C.F.R. §1630.2(o)(3). This interactive process requires that the employer make "a good faith effort to participate in that discussion." *Curry*, 286 Conn. at 416. However, in *McBride v. BIC Consumer Products Mfg. Co. Inc.*, the Second Circuit held that an employer's failure to engage in a sufficient interactive process cannot alone form the basis of a claim under the ADA, rather to avoid summary judgment, a plaintiff must also establish that he or she was qualified for the position at issue. 538 F.3d 92 (2d Cir. 2009).

Here, Plaintiff proffered two potential reasonable accommodations. In December 2007, after receiving notification that he was being assigned back to patrol starting in January, 2008, Plaintiff requested to continue his assignment in booking. [Dkt. #63, Pl. Rule 56 Stmt. ¶88]. In November 2009, Plaintiff requested assignment to BPD's canine unit. *Id.* at ¶100.

Assuming *arguendo* that BPD was aware of Plaintiff's disability between June 2007 and December 2007, BPD was not required to grant his request to remain in booking. The ADA does not obligate an employer to provide an employee with the accommodation requested; the employer need only provide some reasonable accommodation. *See Hennenfent  v. Mid Dakota Clinic, P.C.*, 164 F.3d 419 (8th Cir. 1998) Moreover, although a reasonable accommodation may include reassignment of an employee to a vacant position for which he or she is qualified, the ADA does not require an employer to create a new position in order

to provide an accommodation. *Picinich v. United Parcel Service*, 321 F.Supp.2d 485, 505 (N.D.N.Y 2004).  BPD had an established policy of rotating officers through booking, rather than letting an officer remain in a position in booking for an extended period of time. [Dkt. #44, Defs. Rule 56 Stmt. ¶84].  Therefore, there was no vacancy in booking to provide a potential reasonable accommodation. *See Picinich*, 321 F.Supp.2d at 505 (holding that the ADA does not require employers to create a new position for an employee in order to accommodate him or her).

Further, Plaintiff's second request to be placed in the canine unit did not suggest  a reasonable accommodation. In or around November or December 2008, Plaintiff approached Chief Gaudett and spoke with him about the possibility of coming back to work and being assigned to the canine unit. [Dkt. #44, Def. Rule 56 Stmt., ¶¶98-100]. Chief Gaudett considered this request, but ultimately denied it. Assignment to the canine unit is governed by the Bridgeport police collective bargaining agreement, which provides that assignment to the unit must be done through a seniority bid process. *Id.* at ¶105; Ex.B, at 232:16-23. When a vacancy arises in the unit, all interested candidates must submit their names and the most senior applicant is automatically selected for the position.  *Id.* at ¶106; Ex. P, ¶13.

In *U.S. Airways, Inc. v. Barnett*, the Supreme Court held that an employer may not automatically reject a proposed accommodation as unreasonable where appointment to the position would violate an established seniority system. 535 U.S. 391 (2002). However, the Court emphasized that ordinarily, a proposed accommodation in violation of a seniority system would not constitute a

reasonable accommodation. *Id.* at 403. In order to refute this conclusion, a plaintiff must present special circumstances warranting a finding that, "despite the presence of a seniority system (which the ADA may not trump in the run of cases), the requested 'accommodation' is 'reasonable' on the particular facts." *Id.* at 405. As further clarification, the Court provided an example of such special circumstances, stating that "plaintiff might show, for example, that the employer, having retained the right to change the seniority system unilaterally, exercises that right fairly frequently, reducing employee expectations that the system will be followed—to the point where one more departure, needed to accommodate an individual with a disability, will not likely make a difference." *Id.* at 405. Moreover, the Court noted that collectively bargained seniority systems, as opposed to seniority systems unilaterally imposed by management, are more likely to prevent a proposed accommodation from being "reasonable." *Id.* at 404.

BDP's seniority system is the product of a collective bargaining agreement. [Dkt. #44, Defs. Rule 56 Stmt. ¶105]. Plaintiff has not presented any special circumstances warranting deviation from the seniority system and has therefore failed to sustain his burden to establish that the desired position would be a reasonable accommodation, despite the conflict with a seniority system.

Additionally, no vacant positions existed in the canine unit at the time of Plaintiff's request. The organizational structure of the canine unit required only one sergeant as a supervisor, and at the time Mr. Martinsky made his request, that position was filled. *Id.* at ¶¶ 112-113; Ex. P, ¶17. The ADA does not require the BPD to create a position as part of a reasonable accommodation. *See Norville v.*

*Staten Island Univ. Hosp.*, 196 F.3d 89, 99 (2d Cir. 1999) (holding that employers need not create a new job to accommodate a disabled employee).

Therefore, Plaintiff's proposed assignment to the canine unit was not a reasonable accommodation due to the fact that it would violate the collective bargaining agreement and the position was not vacant.  Plaintiff has not met his burden in providing a reasonable accommodation that would not cause an undue burden on the Bridgeport Police Department.


**A. BPD's Reasonable Accommodation of Reassignment to the Training Unit**

In an attempt to accommodate Plaintiff's disability, the BPD offered him a position in the Training Unit.  Unlike the position in the canine unit, an assignment to the training academy is a non-patrol position, located in a separate building in an entirely different location from the rest of the department. [Dkt. #63, Pl. Rule 56 Stmt. ¶116; #2, Aff. of Martinsky at ¶24]. Plaintiff asserted that an assignment in the training academy did not provide a reasonable accommodation because the training unit was not under video surveillance and to his knowledge every officer, including those with whom he was in conflict, had access to the training area. *See Id.* at ¶¶106-07, 109-13. Thus, Plaintiff contends that assignment to the training unit was not only a less desirable position, but also would not address his safety concerns. *See Id.* at ¶¶117-18.

The reasonableness of an accommodation under the ADA involves a case-by-case inquiry which considers the effectiveness of the modification in light of the nature of the disability in question and the cost of implementing the

modification. *Goldring v. Sillery Mayer & Partners*, 199 F.Supp.2d 55, 62 (citing *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995). A reasonable accommodation can include reassignment to a vacant position. *See id; see also* 42 U.S.C. § 12111(9)(B); 34 C.F.R. §104.12.

After determining that Plaintiff's requested accommodations of a permanent assignment in booking and an assignment to the canine unit were contrary to established BDP policies, the department suggested that Plaintiff be assigned to the training unit. [Dkt. #44, Defs. Rule 56 Stmt. ¶115]. The training unit offered a vacant, non-patrol position indoors and separate from the rest of the department. As part of the training unit, Plaintiff could continue to hold a supervisory position with the same status as his previous position and the BDP would not have to incur added costs in meeting patrol duties or violate the BPD's collective bargaining agreement. The assignment to the training unit addresses Plaintiff's primary concerns by allowing him to avoid resuming duties in patrol yet remain an active officer and would keep him separated from the officers by whom he felt threatened. Compliance with the ADA does not require employers to provide the exact accommodation requested. *Alster v. Goord*, 745 F.Supp.2d 317 (S.D.N.Y. 2010) (citing *Cole v. Goord*, No. 05-Civ. 2902 (GEL), 2009 WL 2601369 (S.D.N.Y. Aug. 25, 2009)). BDP's placement of Plaintiff in the training unit constituted a reasonable accommodation under the ADA standards. There is therefore no reasonable view of the evidence whereby BDP failed to accommodate Plaintiff's disability and Plaintiff's claim of failure to accommodate cannot stand.

### III. HOSTILE WORK ENVIRONMENT

Plaintiff alleges in his complaint that the BPD's conduct towards him regarding his disability created a hostile work environment in violation of the ADA's anti-discrimination provisions. BPD asserts that Plaintiff did not notify the BDP of his disability until January 2008, after he had already gone on medical leave.  Therefore, BPD argues that Plaintiff cannot allege any set of facts to establish that BPD discriminated against him because of his disability as no one in the Department had any actual or constructive knowledge of his disability from June 11, 2007 through January 2, 2008.

Although Plaintiff asserts that the ADA gives rise to a cause of action for hostile work environment, the Second Circuit has not explicitly decided whether this cause of exists under the ADA.  *Farina v. Branford Bd. of Educ.*, No. 3:09-CV-49 (JCH), 2010 WL 3829160, at * 15 (D. Conn. Sept. 23, 2010) (citing *Bonura v. Sears Roebuck & Co.*, 62 Fed.Appx. 399, 400 n. 3 (2d Cir. 2004)). Nonetheless, some district courts within the Second Circuit have recognized such claims. *See e.g., Monterroso v. Sullivan & Cromwell, LLP*, 591 F.Supp.2d 567, 584 (S.D.N.Y 2008). Moreover, "the circuits that have reached this question have answered it in the affirmative." *Bonura*, 62 Fed.Appx. at 400 n.3. However, even if the ADA supports such a cause of action, Plaintiff cannot establish the elements of a hostile work environment claim.

Courts that have recognized hostile work environment claims under the ADA apply the same standard utilized in Title VII cases. *See e.g., Shaver v.*

*Independent Stave Co.*, 350 F.3d 716, 720 (8th Cir. 2003) ("In determining whether a hostile work environment claim has been made out under the ADA, we think it proper to turn to standards developed elsewhere in our anti-discrimination law, adapting them to the unique requirements of the ADA"); *Fox v. General Motors Corp.*, 247 F.3d 169, 176-77 (4th Cir. 2001) (noting that several other circuits have held that the ADA includes a cause of action for hostile environment harassment modeled after the Title VII cause of action, and so holding); *Flowers v. Southern Regional Physician Services Inc.*, 247 F.3d 229, 235-36 (5th Cir. 2001) ("A cause of action for disability-based harassment is 'modeled after the similar claim under Title VII'") (citation omitted).

As the Second Circuit recognized in *Kassner v. 2nd Ave. Delicatessen Inc.*, in order to prevail under the standard, a plaintiff must establish two elements. First, for a work environment to be sufficiently hostile so as to be actionable, the workplace must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently pervasive to alter the conditions of the victim's employment." 496 F.3d 229, 240 (2d Cir. July, 2007) (citing *Brennan v. Metro Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999). The determination of hostility "depends on whether a reasonable person would find the work environment to be hostile and whether plaintiffs subjectively perceived it to be so. *Id.*

In evaluating a hostile work environment claim, a court should consider the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *See Harris v.*

34

*Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767-68 (2d Cir. 1998). "Generally, isolated incidents of harassment do not give rise to a hostile work environment claim; instead, the incidents must be 'sufficiently continuous and concerted in order to be deemed persuasive.'" *Balonze v. Town Fair Tire Ctrs.*, No. 3:02cv2247, 2005 WL 752198, at *8 (D.Conn. Mar. 31, 2005) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)). "'Simple teasing, offhand comments, and isolated incidents . . . will not amount to discriminatory changes in the terms and conditions of employment sufficient to meet the threshold of severity or pervasiveness.'" *Crawford v. N.Y. Life Ins. Co.*, No. 04-CV-1853, 2006 WL 2792779, at *8 n. 4 (E.D.N.Y. Sept. 27, 2006) (*quoting Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

Second, to successfully raise a hostile work environment claim, a plaintiff must show that "a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Murray v. N.Y. Univ. Coll. Of Dentistry*, 57 F.3d 243, 249 (2d Cir. 1995) (*citing Karibian v. Columbia Univ.,* 14 F.3d 773, 779 (2d Cir. 1994). "[E]mployer liability for a hostile environment created by coworkers, or by a low-level supervisor who does not rely on his supervisory authority in carrying out the harassment, attaches only when the employer has 'either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Id.* (*quoting Kotcher v. Rosa & Sullivan Appliance Ctr. Inc.,* 957 F.2d 59, 63 (2d Cir. 1992)); *see Karibian*, 14 F.3d at 780.

Plaintiff has not established either element of a hostile work environment claim under the ADA. Even construed in the light most favorable to Plaintiff, the

non-moving party, Plaintiff's allegations regarding the treatment he was subjected to at the BPD do not suggest a work environment permeated with discriminatory intimidation, ridicule, and insult based on his disability. Rather, Plaintiff asserted that Defendant Paris's menacing behavior and explicit threat to kill him on June 11th made Plaintiff fear for his life. *See* [Dkt. #63, Pl. Rule 56 Stmt., Disputed Facts ¶¶21, 25, 29 (describing the symptoms Plaintiff experienced, including acute anxiety, debilitating fear, immobilizing panic attacks, stomach and chest pains, faintness and diarrhea)]. Plaintiff's increased panic and discomfort in the workplace based on these threats and fear of retaliation prompted Plaintiff to request remaining on booking duty for an extended period of time. *Id.* at ¶27. Therefore, Plaintiff's asserted anxiety at work stemmed from the threat of retaliation, not from any ridicule based on Plaintiff's alleged disability.

In fact, Plaintiff did not disclose his disability to superiors at the BPD until he went on sick leave on January 2, 2008. Plaintiff's letter in October 2007 to Chief Norwood requesting to remain in booking stemmed from his need for video surveillance due to his fear of retaliation, not from a disclosed disability. *See* [Dkt. 69, Def. Reply to Pl. Motion for Summary Judgment, Ex. H].  Plaintiff's letter began by stating his intention "to officially inform you of the conflict I have with certain officers." *Id.* Plaintiff's letter continued to state his request to have "no contact with the following officers [. . .] since I fear retaliation." *Id.*  This letter clearly conveys a fear of retaliation, rather than an environment permeated with discriminatory insult and ridicule.

Plaintiff's two allegedly adverse interactions with Sgt. Paris between the June 11, 2007 incident and his departure on sick leave January 2, 2008 include: (1) Sgt. Paris entering the booking office once while Plaintiff was working without apparent reason and; (2) sending Plaintiff a form letter, stating that Plaintiff was being taken off the overtime list because he had not worked overtime for 60 days. [Dkt. #63, Pl. Rule 56 Stmt. ¶77]. This conduct on the part of Defendant Paris could not constitute harassment against Plaintiff based on his disability because his disability was undiagnosed until February 2008, and was not conveyed to his superiors until January 2, 2008. *Id.* at ¶¶ 93, 94. Although Sgt. Paris's two instances of contact with Plaintiff may have led Plaintiff to feel threatened, these two instances of contact included no mention of Plaintiff's disability, and thereby cannot be found to constitute disability-based harassment actionable under the ADA. 42 U.S.C. §12112(a) (providing that no employer covered by the ADA "shall discriminate against a qualified individual with a disability *because of the disability* of such individual" (emphasis added).

Plaintiff asserts that his superiors subjected him to a hostile work environment because of his condition by denying his requested accommodations despite being aware that he felt physically threatened and terrified of returning to patrol, that it would likely result in the exacerbation of his condition, and/or that plaintiff could not continue working if he was sent to patrol. [Dkt. #63, Pl. Rule 56 Stmt. ¶94].  However, even if his superiors conduct in denying his requests amounted to harassment under the ADA, this conduct could not have been on the basis of his disability because prior to January 2, 2008, Plaintiff admittedly had

not made his superiors aware of the fact that he had a medical or psychiatric condition or disability that made him unable to return to patrol duty. *Id.* at ¶93.

Moreover, rather than demonstrating discriminatory intent or harassment, BPD's actions demonstrate an attempt to accommodate Plaintiff's fears. After Plaintiff went on sick leave and BPD became aware of a potential disability, BPD then afforded Plaintiff the opportunity to work in the training unit as a reasonable accommodation for his panic disorder. Neither Sgt. Paris nor BPD's actions amount to a hostile work environment due to Plaintiff's alleged disability.

Plaintiff's facts concerning his discrimination allegation, taken as true, do not provide any issue of material fact for which a reasonable jury could find in his favor. Plaintiff has not presented sufficient evidence to prove that discrimination was the real reason for his termination and that BPD did not offer a reasonable accommodation. Accordingly, summary judgment as to Plaintiff's ADA and CFEPA claim must be granted.

## V. FALSE ARREST CLAIM

False arrest claims regarding Defendant Paris must be analyzed apart from claims against other members of the Bridgeport Police Department (Frank Santora, James Viadero, and James Honis). As plaintiff's ex-business partner, Defendant Paris possessed a different level of knowledge as to the ownership of the disputed items than Defendants Santora, Viadero, and Honis. Due to this heightened level of knowledge regarding the alleged larceny that occurred on

June 11, 2007, the false arrest claims against Paris must be analyzed separately from the other defendants.

**A. False Arrest Claims Against Defendants Santora, Viadero, and Honis**

In analyzing a Section 1983 false arrest or imprisonment, federal courts apply the law of the state where the arrest occurred. *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004). Under Connecticut law, the applicable law for false arrest and false imprisonment is identical. *Russo v. City of Bridgeport*, 479 F.3d 196, 204 (2d Cir. 2007). Accordingly, the Court will address these issues jointly. The applicable law in Connecticut provides that, "'[f]alse imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another.'" *Id.* at 204 (2d Cir. 2007) (*quoting Outlaw v. City of Meriden*, 43 Conn. App. 387, 392 (1996)). Connecticut law places the burden on the false arrest plaintiff to prove the absence of probable cause. *See Davis*, 364 F.3d at 433 (citing *Beinhorn v. Saraceno*, 23 Conn.App. 487, 491, 582 A.2d 208 (1990)); *see also Vangemert v. Strunjo*, No. 3:08CV00700 (AWT), 2010 WL 1286850, at *4 (D.Conn. Mar. 29, 2010).

In their motion for summary judgment, Defendants argue that they had probable cause to arrest Plaintiff for violating Connecticut's misdemeanor larceny statute, Conn. Gen. Stat. §53a-125a, and therefore they cannot be held liable for a false arrest claim. Additionally, Defendants argue that Plaintiff was never seized under the meaning of the Fourth Amendment because he was issued a summons rather than being formally arrest and booked at the police department.

**1. Seizure under the Fourth Amendment**

As the Second Circuit has recognized, "Section 1983 claims of deprivations of liberty related to criminal prosecutions implicate the Fourth Amendment right to be free of unreasonable seizure of the person." *Burg v. Gosselin*, 591 F.3d 95, 97 (2d Cir. 2010) (citation omitted).  Accordingly, a plaintiff seeking to assert such a claim must "show some deprivation of liberty consistent with the concept of 'seizure.'" *Id.* (citing *Singer v. Fulton County Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995).  Although in *Burg*, the Second Circuit held that "a pre-arraignment, non-felony summons requiring no more than a later court appearance does not constitute a Fourth Amendment seizure," the court expressly noted that a plaintiff may be seized if directed to remain in place while the police officer prepares the summons. 591 F.3d at 96, 101.

Here, although Plaintiff arrived voluntarily at the scene at the same time as Lt. Santora, Plaintiff alleges that the instructions he received from several officers to remain on the scene amounted to a seizure under the Fourth Amendment because he felt that he was not free to leave. Specifically, Plaintiff alleges that Lt. Santora directed Plaintiff to wait while he spoke with Sgt. Paris. [Dkt. #63, Pl. Rule 56 Stmt.  ¶64].  Plaintiff further alleges that when Lt. Santora returned, he advised plaintiff that he was being arrested for stealing the Savoy's property. [Dkt. #44, Defs. Rule 56 Stmt. ¶47]. Plaintiff then claims that Defendants Honis and Viadero arrived on the scene around the time Lt. Santora informed plaintiff of his arrest. [Dkt. #1, Pl. Compl. ¶27].  Plaintiff claims that Honis told him that he could leave if

he would agree to come into the detective bureau the next day to give a statement. *Id.* at ¶¶ 30-32.  However, Plaintiff then alleges that Viadero again told Plaintiff he was being arrested and said that he couldn't leave. *Id.* at ¶ 33.

Construing all facts in favor of Plaintiff, the non-moving party, the Court assumes *arguendo* that the orders to remain, coming from on-duty police officers, constituted a seizure under the Fourth Amendment, as Plaintiff, consistent with a reasonable person in his situation, did not feel free to leave. *Amore v. Novarro*, 624 F.3d 522, 532 fn. 13 (2d Cir. 2010) (citing *Burg*, 591 F.3d at 96, n.3).  However, even assuming that Plaintiff was seized under the Fourth Amendment while instructed to remain on the scene, Plaintiff's claim of false arrest fails because he cannot sustain his burden of proving that the Defendant officers lacked probable cause.

## 2. Defense of Probable Cause

It is well established that probable cause is a complete defense to an action for false arrest. *Russo*, 479 F.3d at 203 ("in Connecticut, a false arrest claim cannot lie when the challenged arrest was supported by probable cause").  Moreover, a claim for false arrest turns only on "the validity of the *arrest*, and not on the validity of each charge, or indeed any charge actually invoked by the arrest officer at the time of the arrest." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006).  The Second Circuit has held that "Federal and Connecticut law are identical in holding that probable cause to arrest exists when police officers have 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the

person to be arrest has committed or is committing a crime.'" *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (*quoting Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).  The Second Circuit further explained that "probable cause is a fluid concept . . . not readily, or even usefully, reduced to a neat set of legal rules . . . While probable cause requires more than a mere suspicion of wrongdoing, its focus is on probabilities, not hard certainties." *Id.* (internal quotation marks and citation omitted). Moreover, the Second Circuit instructed that "[i]n assessing probabilities, a judicial officer must look to the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* In sum, probable cause "requires only such facts as make wrongdoing or the discovery of evidence thereof probable." *Id.* at 157.  Another court in this district has held that "the court may determine the existence of probable cause as a matter of law 'if there is no dispute as to the pertinent events and the knowledge of the officers[.]'" *Johnson v. Ford*, 496 F. Supp. 2d 209, 213 (D. Conn. 2007) (*quoting Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

 For the charge of larceny to be supported by probable cause, the facts and circumstances known to the Defendants at the time the summons was issued must have been sufficient to warrant a person of reasonable caution to believe that Plaintiff had violated the elements of Conn. Gen. Stat. §53a-110, appropriating property and withholding it. *Walczyk*, 496 F.3d, at 156.

 Here, it is undisputed that Plaintiff took property from the common area of the basement, secured it in a different, locked section of the Gallery that was inaccessible to the supposed owners of the items, and covered the items so they

could not be seen. [Dkt. #44, Defs. Rule 56 Stmt. ¶¶40-42; Dkt #63, Pl. Rule 56 Stmt. ¶42]. Plaintiff admitted to the questioning officers that he moved the property. [Dkt. #44, Defs. Rule 56 Stmt. ¶¶52-53; Dkt. #63, Pl. Rule 56 Stmt. ¶¶52-53]. The officers then visited the basement area and confirmed the fact that the items were locked in an inaccessible place. [Dkt. #44, Defs. Rule 56 Stmt. ¶43]. The officers were aware that Plaintiff was disputing ownership of the items, but felt that Plaintiff's actions, in visiting the building while on duty, removing items from the basement, placing the items in a locked compartment, and obscuring the items from vision, demonstration an element of deception. *Id.* at ¶54.

The facts and circumstances available to the Defendant officers at the time the summons was issued were sufficient to warrant a person of reasonable caution to believe that Plaintiff had committed larceny. *Walczyk*, 496 F.3d, at 156. Despite the disputed element of ownership the officers acted on reliable information at the scene to conclude that there was probable cause to believe that the property did not in fact belong to the Plaintiff. The officers were directly told by both Sgt. Paris and Ms. Viglione that the property moved to the City Lights Gallery belonged to them as proprietors of the Savoy restaurant. [Dkt. #44, Defs. Rule 56 Stmt. ¶¶28-30, 39]. Both individuals stated to officers at the scene that Plaintiff had no legal right to enter the basement and that he had sold his rights to the business more than a year beforehand. *Id.* at ¶¶13-14, 28-30. They further specifically informed the officers that the items Plaintiff moved into the locked storage area of another business in fact belonged to the Savoy. *Id.* at ¶¶28-30, 39. Moreover, Plaintiff himself admitted to having moved the property to the locked

area of the basement, asserting a right to the circus posters but not the other items, and the officers verified its placement in the locked area.

Whether or not the statements made by Sgt. Paris and/or Ms. Viglione were truthful is irrelevant as long as the defendant officers relied on them in good faith. *See Escalera v. Lynn*, 361 F.3d 737, 745 (2d Cir. 2004) ("[T]he actual accuracy or veracity of the statement is irrelevant to a determination of whether [defendant] has arguable probable cause. Rather, the question is whether [defendant] could have reasonably relied on it"). Moreover, it was appropriate for the officers to rely on the information provided to them by Sgt. Paris and Ms. Viglione. Ms. Viglione, as the potential victim of a crime, is entitled to a high degree of credibility. *See Martel v. South Windsor*, 345 Fed.Appx. 663, 664 (2d Cir. 2009) ("when information is received from a putative victim . . . probable cause exists unless the circumstances raise doubt as to the person's veracity") (citing *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001)). No evidence exists to indicate that the defendants knew anything about Ms. Viglione's relationship with the Plaintiff to detract from the truthfulness of her statements. Absent evidence to the contrary, defendants reasonably relied on her reports as the victim of the alleged crime.

Even assuming *arguendo* that defendants could not rely on Defendant Paris's statements, Defendants could reasonably rely on the statements made to them by an eyewitness to the supposed theft, Mr. Falcigno, which affirmed Defendant Paris's assertions. [Dkt. #44, Defs. Rule 56 Stmt. ¶¶23-26]. Based on the questioning of the Plaintiff, Defendant Paris, Mr. Falcigno, and Ms. Viglione, the Defendants fulfilled their responsibility to determine whether probable cause

existed. As the Second Circuit has recognized, "[p]robable cause does not require an officer to be certain that subsequent prosecution of the arrestee will be successful. It is therefore of no consequence that a more thorough or probing investigation might have cast doubt upon the situation." *Krause v. Bennett*, 887 F.2d 362, 371 (2d Cir. 1989) (internal quotations omitted) (*quoting United States v. Manley*, 634 F.2d 978, 984 (2d Cir. 1980)).

Plaintiff's allegations that the Defendants had an improper motive in issuing Plaintiff a summons, or that they conspired with Defendant Paris to effectuate an unlawful arrest are irrelevant. Where probable cause exists for the arrest, the officer's underlying motive in arresting and charging the plaintiff will not be examined by the courts. *See Singer v. Fulton County Sheriff*, 63 F.3d 110, 120 (2d Cir. 1995) ("We have held previously that if the officer either had probable cause or was qualifiedly immune from subsequent suit [ . . . ] then we will not examine the officer's underlying motive").

The Court's determination that Defendants' had probable cause to issue Plaintiff the summons also establishes that Defendants' are entitled to qualified immunity. The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate established statutory or constitutional rights of which a reasonable person should have known." *Pearson v. Callahan*, 555 U.S. 223 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Because Defendants' had probable cause to issue the summons, the arrest did not violate Plaintiff's statutory or constitutional rights.

**B. Qualified Immunity**

The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate established statutory or constitutional rights of which a reasonable person should have known." *Pearson v. Callahan*, 555 U.S. 223 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity "shield[s] executive employees from civil liability under §1983 if either (1) their conduct did not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable [for them] to believe that their acts did not violate these clearly established rights." *Pearson*, 555 U.S. at 815-816 (citing *Saucier v. Katz*, 553 U.S. 194 (2001); *see also Okin v. Village of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 433 (2d Cir. 2009) ("A police officer who has an objectively reasonable belief that his action are lawful is entitled to qualified immunity.")

As the Court has determined, Defendants had probable cause to issue Plaintiff a summons. Defendants' conduct was therefore consistent with Plaintiff's Fourth Amendment right to be free of an unlawful or false arrest, and Defendants are entitled to qualified immunity.

Plaintiff's alleged facts concerning his false arrest claim, taken as true, do not provide any issue of material fact for which a reasonable jury could find in his favor. Plaintiff has not presented sufficient evidence to prove that Defendants lacked probable cause to issue him a summons. Accordingly, summary judgment as to Plaintiff's false arrest claim against Defendants Santora, Viadero, and Honis must be granted.

### C. False Arrest Claim Against Defendant Paris

In analyzing a Section 1983 false arrest or imprisonment, federal courts apply the law of the state where the arrest occurred. *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004). Under Connecticut law, the applicable law for false arrest and false imprisonment is identical. *Russo v. City of Bridgeport*, 479 F.3d 196, 204 (2d Cir. 2007). Accordingly, the Court will address these issues jointly. The applicable law in Connecticut provides that, "'[f]alse imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another.'" *Id.* at 204 (2d Cir. 2007) (*quoting Outlaw v. City of Meriden*, 43 Conn. App. 387, 392 (1996)). Connecticut law places the burden on the false arrest plaintiff to prove the absence of probable cause. *See Davis*, 364 F.3d at 433 (citing *Beinhorn v. Saraceno*, 23 Conn.App. 487, 491, 582 A.2d 208 (1990)); *see also Vangemert v. Strunjo*, No. 3:08CV00700 (AWT), 2010 WL 1286850, at *4 (D.Conn. Mar. 29, 2010).

Defendant Paris argues that he, along with the arresting officers, had probable cause to arrest Plaintiff for violating Conn. Gen. Stat. §53a-125a, misdemeanor larceny and therefore cannot be held liable for a false arrest claim. Additionally, Defendant Paris argues that Plaintiff was never seized under the meaning of the Fourth Amendment because he was issued a summons rather than formally booked at the police department.

### 1. Plaintiff was seized

As discussed above, the Court assumes *arguendo* that Plaintiff was seized under the meaning of the Fourth Amendment, of his reasonable belief that he was not free to leave the scene.

## 2. False Arrest

Under Connecticut law, "[a] person is not liable for false imprisonment unless his act is done for the purpose of imposing a confinement, or with knowledge that such confinement will, to a substantial certainty, result from it." *Green v. Donroe*, 186 Conn. 265, 268 (1982) (*citing* 32 Am. Jur. 2d, False Imprisonment s 9; Restatement of Torts (Second) § 43). Further, it is well established that probable cause is a complete defense to an action for false arrest. *Russo*, 479 F.3d at 203 ("in Connecticut, a false arrest claim cannot lie when the challenged arrest was supported by probable cause").

As a preliminary matter, the Court takes note that at the time Defendant Paris called Lt. Santora to notify him of his concern that Plaintiff had committed a crime on the premises of the Savoy restaurant, Defendant Paris was off duty. [Dkt. #44, Def. Rule 56 Stmt. ¶16, Dkt. #63, Pl. Rule 56 Stmt. ¶16]. Therefore, unless Plaintiff can establish that Defendant was acting under color of law, Defendant Paris, as a citizen acting in his individual capacity and not as an on duty police officer, may not be liable under §1983 for false arrest. *See Pitchell v. Callahan*, 13 F.3d 545, 547-548 (2d Cir. 1994) (holding that in order to maintain a section 1983 action, the conduct complained of must have been committed under color of state law). As the Second Circuit in *Pitchell* explained, acting under the

color of law means "under the 'pretense of law' and that 'acts of officers in the ambit of their personal pursuits are plainly excluded.'" 13 F.3d at 547-548 (citing *Screws v. United States*, 325 U.S. 91, 111 (1945). An analysis of whether an officer was acting under the color of law requires more than "a simple determination as to whether an officer was on or of duty when the challenged incident occurred." *Id.* at 548.

Here, Defendant Paris has admitted that he was acting under color of law at the time that he contacted the BPD and Lt. Santora, stating that "I was just letting them know as a police officer - - and I am a police officer twenty-four hours a day - - that I saw a - - what I believe was a larceny and I'm reporting it to my - - or a supervisor, somebody at a higher rank than I was." [Dkt.# 63, Ex.#7b, Dep. of Paris at 150:14-18].

Even though Defendant Paris admits that he was acting under color of law at the time that he contacted Lt. Santora to report Plaintiff's alleged theft, Plaintiff's claims for false arrest under §1983 and under Connecticut state law cannot lie because Defendant Paris had probable cause to arrest Plaintiff, and probable cause is a defense to a claim for false arrest. *See Zainc v. City of Waterbury*, 603 F.Supp.2d 368, 387 (D.Conn 2009) (recognizing that probable cause is a complete defense to claims of false imprisonment and false arrest, and that under Connecticut law, a claim for malicious prosecution against a private person requires the plaintiff to prove that the defendant acted without probable cause).

### 3. PROBABLE CAUSE

Applying the legal standard for probable cause delineated above, even construing the facts in the light most favorable to the Plaintiff, it is apparent that Defendant Paris had probable cause to believe that Plaintiff had stolen property belonging to the Savoy. As Plaintiff notes in his Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, although the Plaintiff had created inventory list, detailing specifically which assets and items of property were transferred to the restaurant pursuant to the sale of his ownership interest in the business, Defendant Paris and his girlfriend, Ms. Viglione, were not involved in the negotiations of the sale, were not at the closing, and were not familiar with the terms of the sales agreement. [Dkt. #63, Pl. Mem. in Opp. to Defs. Motion for Summary Judgment, at 3; Ex. #7a, Dep. of Paris at 70-75]. Therefore, Defendant Paris would not have known if Plaintiff had retained an ownership interest in any of the restaurant property. Moreover, Defendant Paris was notified by Mr. Falcigno that Plaintiff gained access to the basement storage area by claiming to have permission of the building custodian, took several items of property from the restaurant's storage area, moved them to a locked portion of the basement and hid them from view. [Dkt. #44, Defs. Rule. 56 Stmt. ¶¶18-21; Dkt. #63, Pl. Rule 56 Stmt. ¶¶18-21]. These facts and circumstances are more than sufficient to warrant a person of reasonable caution to believe that Plaintiff had committed or was committing a crime. *See Walczyk*, 496 F.3d at 156.

**4. PARIS'S QUALIFIED IMMUNITY CLAIM**

Defendant Paris asserts that even if Plaintiff successfully establishes a deprivation of his constitutional rights through false arrest, he is shielded from liability under the doctrine of qualified immunity. Under the standard for qualified immunity most recently articulated by the Supreme Court in *Pearson v. Callahan*, an executive employee is shielded from civil liability under §1983 if either "(1) their conduct did not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable [for them] to believe that their acts did not violate these clearly established rights." *Pearson*, 555 U.S. at 815-816 (citing *Saucier v. Katz*, 553 U.S. 194 (2001); *see also Okin v. Village of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 433 (2d Cir. 2009) ("A police officer who has an objectively reasonable belief that his action are lawful is entitled to qualified immunity.")

As the Court has determined, Defendant Paris had probable cause to arrest Plaintiff. Defendant Paris' conduct was therefore consistent with Plaintiff's Fourth Amendment right to be free of an unlawful or false arrest, and Defendant Paris is entitled to qualified immunity.

Plaintiff's facts concerning his false arrest claim, taken as true, do not provide any issue of material fact for which a reasonable jury could find in his favor. Plaintiff has not presented sufficient evidence to prove that Defendant Paris lacked probable cause to effectuate his arrest. Accordingly, summary

judgment as to Plaintiff's false arrest claim against Defendant Paris must be granted.

## IV. CONCLUSION

Based on the above reasoning, Defendants' motion for summary judgment is GRANTED.

IT IS SO ORDERED.


_____/s/_____
Vanessa L. Bryant
United States District Judge


Dated at Hartford, Connecticut:  September 2, 2011.